Filed 10/31/14  P. v. Andrade CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>SANSON NOE ANDRADE,<br><br>    Defendant and Appellant. | F065468<br><br>(Super. Ct. No. CRM012561B)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Donald J. Proietti, Judge.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman, Eric L. Christoffersen, and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Sanson Noe Andrade acted as the driver in a drive-by gang murder. He was convicted of first-degree premeditated murder, attempted murder (of a second victim), assault with a semiautomatic firearm, and active participation in a criminal street gang. Andrade argues that his conviction of first-degree premeditated murder must be reversed under *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*) because the instructions given by the court permitted the jury, on the basis of the natural and probable consequences doctrine, to find him guilty of premeditated murder as an aider and abettor of a lesser crime. We agree that *Chiu* means the jury was erroneously instructed in this case, but find the error was harmless.

Andrade makes several additional arguments: his *Miranda*[1] waiver taken before a police interview was not knowing and intelligent; defense counsel was ineffective for failing to object to the testimony of the prosecution's gang expert and failing to request a limiting instruction regarding hearsay statements relied on by the expert; the court improperly admitted police opinion testimony about Andrade's state of mind; and the court erroneously failed to instruct the jury that accomplice testimony must be corroborated and must be viewed with caution. We reject these arguments and affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

On the afternoon of September 4, 2010, Andrade, then 19 years old, drove up to the home of Randy Henson and his sons Eric and Tommy Henson on Frank Avenue in Dos Palos. With Andrade was his brother-in-law, 15-year-old Isaac E. Isaac drew a gun and fired at the three Hensons, who were on the front porch. Tommy Henson was killed and Randy Henson was wounded in the leg.

Andrade and Isaac were Sureños gang members. Eric Henson was a Norteño. Two Sureños, Juan Avalos and Leonel Medina, were friends of Andrade's and had

[1]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

2.

recently been murdered. Eric Henson was once a suspect in those murders, but three other Norteños were eventually arrested instead.

Andrade and Isaac were arrested the day of the Henson shootings. The gun that fired the bullet that killed Tommy Henson was in Andrade's car. Isaac admitted to being the shooter and said the shooting was payback. Andrade admitted he drove Isaac to the scene of the shootings, but denied knowing Isaac had a gun or planned to shoot anyone.

The district attorney filed an information charging Andrade with four counts: (1) murder of Tommy Henson (Pen. Code, § 187, subd. (a));[2] (2) attempted murder of Randy Henson (§§ 187, subd. (a), 664); (3) assault on Randy and Tommy Henson with a semiautomatic firearm (§ 245, subd. (b)); and (4) active participation in a criminal street gang (§ 186.22, subd. (a)). In connection with count 1, the information alleged the special circumstance that Andrade committed the murder while an active participant in a criminal street gang and with an intent to kill. (§ 190.2, subd. (a)(22).) In connection with counts 1, 2 and 3, the information alleged, for sentence enhancement purposes, that Andrade committed the offenses for the benefit of a criminal street gang with intent to promote criminal conduct by gang members. (§ 186.22, subd. (b).) In connection with counts 1 and 2, the information further alleged that a principal used a semiautomatic firearm and proximately caused great bodily injury and death. (§ 12022.53, subds. (d), (e)(1).)

Andrade testified at trial. His defense was that, although he drove Isaac to the Hensons' house and Isaac shot and killed Tommy Henson and wounded Randy Henson, he did not know Isaac had a gun, did not know Isaac intended to shoot anyone, and was not aware that a shooting had taken place until the police told him so. Andrade said Isaac got out of the car to commit the shootings; he did not see Isaac shooting and did not hear the shots because music was playing at high volume in the car.

---

[2]     Subsequent statutory citations are to the Penal Code unless otherwise noted.

The jury found Andrade guilty as charged. It also found the special circumstance and enhancement allegations true. The verdict included findings that the murder and the attempted murder were willful, deliberate and premeditated.

On count 1, the court sentenced Andrade to life in prison without the possibility of parole, plus 25 years to life for the firearm enhancement. On count 2, the court imposed a consecutive sentence of life, plus 25 years to life for the firearm enhancement. The court struck the gang enhancements on counts 1 and 2. Pursuant to section 654, it stayed the sentences on counts 3 and 4.

## DISCUSSION

### I.  Chiu *and the natural and probable consequences doctrine*

On June 2, 2014, after the original briefing was completed in this appeal, the California Supreme Court decided *Chiu, supra*, 59 Cal.4th 155. *Chiu* held that a conviction of premeditated murder cannot be based on the theory that the defendant aided and abetted another offense of which premeditated murder was a natural and probable consequence. Since this was one of the theories of first-degree murder on which the jury was instructed in this case (premeditated murder as a natural and probable consequence of assault with a firearm), we ordered supplemental briefing.[3]

Chiu was accused of urging a confederate to shoot a victim during a fistfight. He admitted he was involved in the fight but denied he knew about the gun or encouraged the shooter to shoot. The victim was shot and killed. (*Chiu, supra*, 59 Cal.4th at p. 160.)

---

[3]  Before *Chiu,* our Supreme Court held that a defendant *can* be found guilty of *attempted* premeditated murder as an aider and abettor of a different offense under the natural and probable consequences doctrine, and that in such a case the jury need not be instructed that the perpetrator's premeditation of killing must be among the things that were natural and probable consequences of the offense the defendant aided and abetted. (*People v. Favor* (2012) 54 Cal.4th 868, 872.) This holding was reaffirmed in *Chiu*, which also held that it was inapplicable to premeditated *murder.* (*Chiu, supra*, 59 Cal.4th at pp. 162-163.) The *Chiu* issue consequently does not arise in the context of Andrade's conviction of attempted murder.

4.

Chiu's jury was instructed that if it found Chiu guilty of aiding and abetting the shooter only in the crimes of assault or disturbing the peace, it could still find him guilty of murder if a reasonable person would know that murder was a natural and probable consequence of the commission of the assault or the disturbance of the peace. The jury was further instructed that the murder was of the first degree if the shooter acted willfully, deliberately and with premeditation. (*Chiu, supra,* 59 Cal.4th at pp. 160-161.)

The court instructed the jury on another theory of murder as well: it could find Chiu guilty of murder if it found he directly aided and abetted the shooter in committing murder. Again, the degree of murder would be determined by finding whether the shooter acted willfully, deliberately and with premeditation. (*Chiu, supra*, 59 Cal.4th at pp. 160-161.) The jury returned a verdict against Chiu of first degree murder. (*Id.* at p. 161.)

The Supreme Court held that it was error to allow the jury to find first degree murder on the theory that Chiu aided and abetted a less serious offense of which murder was a natural and probable consequence. In the court's view, it is not appropriate to impose the increased penalties for *first degree* murder on a defendant who only aided and abetted a lesser offense: "Although we have stated that an aider and abettor's 'punishment need not be finely calibrated to the criminal's mens rea' [citation], the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved and the … public policy concern of deterrence." (*Chiu, supra*, 59 Cal.4th at p. 166.) Consequently, a defendant who aids and abets a lesser crime that would naturally and probably result in murder is guilty only of second degree murder, even if the perpetrator killed with premeditation, provided that the defendant is not guilty of first degree murder under the felony-murder rule set forth in section 189. (*Chiu*, *supra*, at p. 166.)

5.

The Supreme Court emphasized that its holding did not preclude aider and abettor liability for premeditated murder where the defendant aids and abets murder directly. The mental state component for aiding and abetting consists of knowledge of the perpetrator's unlawful purpose plus intent to aid or encourage commission of the crime. Because this mental state "extends to the entire crime, it preserves the distinction between assisting the predicate crime of second degree murder and assisting the greater offense of first degree premeditated murder." (*Chiu, supra*, 59 Cal.4th at p. 167.) Consequently, "[a]n aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent." (*Ibid.*)

The Supreme Court then turned to the question of whether the error was harmless or not. The jury was given both the erroneous instructions allowing it to find premeditated murder based on the natural and probable consequences doctrine, and correct instructions allowing it to find Chiu guilty of aiding and abetting premeditated murder directly. The error would be harmless if the record showed beyond a reasonable doubt that the jury must have relied on the latter, legally valid, theory. (*Chiu, supra,* 59 Cal.4th at p. 167.) The record of discussions between the court and jurors during deliberations showed that the jury apparently was deadlocked at one point on whether to find first degree or second degree murder, and this could have been because of one juror's reluctance to find premeditated murder based on the natural and probable consequences doctrine. Further, the verdict of first degree murder was reached only after that juror was relieved and replaced by an alternate. It followed that the jury could have relied on the erroneous natural and probable consequences instruction, so the error was not harmless beyond a reasonable doubt. (*Id.* at pp. 167-168.)

The court upheld the Court of Appeal's reversal of Chiu's first degree murder conviction. On remand, the prosecution was to be given a choice between accepting a

6.

reduction of the conviction to second degree murder and retrying the first degree murder charge under a theory of direct aiding and abetting. (*Chiu, supra*, 59 Cal.4th at p. 168.)

In this case, the trial court first instructed the jury that Andrade could be guilty of a crime based on aiding and abetting a perpetrator who committed the crime. Andrade was guilty as an aider and abettor if he knew of the perpetrator's unlawful purpose, intended to aid or encourage the commission of the crime, and did in fact aid or encourage it. Next, the court told the jury it could find Andrade guilty of murder if it found that he was guilty of assault with a firearm, that a coparticipant in the assault with a firearm committed murder, and that the murder was a natural and probable consequence of the assault. Third, the court instructed that the jury could find Andrade guilty of murder if he engaged in a conspiracy with Isaac to commit murder and Isaac committed murder. Fourth, the jury was told that Andrade could be guilty of murder if he conspired to commit battery or disturbing the peace by fighting in public, and if murder was a natural and probable consequence of that conspiracy. Finally, the court told the jury that if it found Andrade guilty of murder, it could find the murder to be of the first degree if Isaac acted willfully, deliberately and with premeditation.[4]

The instructions stating that Andrade could be found guilty of murder (and that this murder could be found to be of the first degree) if he aided and abetted another offense of which murder was a natural and probable consequence have the same defect as the instructions held invalid in *Chiu*: They allowed a first degree murder conviction under the natural and probable consequences doctrine based on aiding and abetting another offense. Under *Chiu*, we must reverse unless the error was harmless beyond a reasonable doubt.

---

[4]     The instruction actually says that the murder is of the first degree if "[t]he defendant" acted with this mental state. In closing argument, however, the prosecutor explained that the instruction here meant to refer to Isaac, not Andrade.

The People point out that, in making the special-circumstance finding under section 190.2, subdivision (a)(22), the jury necessarily determined that Andrade intended to kill.[5] We agree with the People's argument that this finding shows the *Chiu* error was harmless beyond a reasonable doubt, for it is compatible only with the theory that Andrade aided and abetted murder directly. The point of giving the jury the natural and probable consequences instructions was to enable it to find Andrade guilty of murder even if it believed his intent was only to help Isaac commit assault with a firearm, battery or a disturbance of the peace. Since it believed he intended to kill, there was no reason for it to resort to that indirect route in finding him guilty of murder. In sum, the finding makes it clear that the jury found Andrade intentionally helped Isaac commit murder. Therefore there is no likelihood the natural and probable consequences instructions caused them to reach a murder verdict they otherwise would not have reached.

Andrade argues that the finding of intent to kill under the instructions for section 190.2, subdivision (a)(22), does not show that the *Chiu* error was harmless because intent is not the same as premeditation. The significance of the jury's intent finding, however, is not that it shows that Andrade is guilty of premeditated murder, but that a rational jury believing Andrade intended to kill would not have found him guilty of murder under the natural and probable consequences instructions, since the latter instructions were given to provide the jury a route to a murder conviction without a finding of intent to kill. The jury's intent finding removes the possibility that the jury

---

[5] Section 190.2, subdivision (a)(22), provides for a punishment of death or life imprisonment without possibility of parole for a first degree murderer who "intentionally killed the victim while … an active participant in a criminal street gang … and the murder was carried out to further the activities of the criminal street gang."

The jury was instructed that to find this special circumstance true, it must find that Andrade—not just Isaac—had an intent to kill. The prosecutor in closing argument also emphasized in his discussion of the special circumstance that it was Andrade's intent to kill that was important, not Isaac's.

relied on the natural and probable consequences doctrine, and that is the only possibility that could give rise to reversible error under *Chiu*. Premeditation was established separately, under instructions of which Andrade does not dispute the validity.

In his original briefing, Andrade argued that the instructions also were erroneous because they did not say that premeditation is one of the things that must be a natural and probable consequence of the crime he intended to aid and abet. This issue is moot in light of the holding in *Chiu* that a first degree murder conviction cannot be based on the natural and probable consequences doctrine under any set of instructions.

## II. Miranda *waiver*

When Andrade was interviewed by police, his *Miranda* rights were read to him and he waived them by making a statement. He now argues that his waiver was not knowing and intelligent because the evidence showed he had low intelligence and poor English skills. We conclude the trial court did not err in finding Andrade's waiver to be adequate.

A criminal defendant's Fifth Amendment rights under *Miranda* are impliedly waived if, having heard and understood an officer's recitation of those rights, the defendant speaks to police. (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 384.) To be effective, a waiver must be not only voluntary, but also knowing and intelligent. (*Colorado v. Spring* (1987) 479 U.S. 564, 573.) The trial court considers the totality of the circumstances, including the defendant's background, experience and conduct, in determining whether these requirements have been met. (*People v. Williams* (2010) 49 Cal.4th 405, 425; *People v. Bradford* (1997) 14 Cal.4th 1005, 1034.)

We review the trial court's factual findings for substantial evidence and review independently its determination of whether those facts reveal a valid waiver. (*People v. Gurule* (2002) 28 Cal.4th 557, 601.) In a related context (voluntariness of a confession), it has been held that when the record includes a recording of the interview, there is no conflict in the evidence and the only standard of review is the de novo standard. (*People*

*v. McClary* (1977) 20 Cal.3d 218, 227, overruled on other grounds by *People v. Cahill* (1993) 5 Cal.4th 478, 509-510, fn. 17; *People v. Vasila* (1995) 38 Cal.App.4th 865, 873.) As will be seen, however, the totality of the circumstances here included not only a recorded interview but also expert testimony about Andrade's intellectual functioning. There is a conflict in the evidence regarding Andrade's ability to understand. Consequently, we apply the substantial evidence standard of review to the trial court's factual findings in this case, but we do so after viewing the recording and exercising our own judgment about the degree of understanding it reflects.

Andrade moved to suppress his statement on the ground that his *Miranda* waiver was not knowing and intelligent. The court held an Evidence Code section 402 hearing on the question of the adequacy of the waiver. It viewed the video recording of the interview, which was conducted in English without an interpreter. It heard testimony by Charles Hale, the police detective who conducted the interview, and Richard Blak, a psychologist retained by the defense. The court ruled that the statement was knowing and intelligent and was admissible.

When Hale read Andrade his *Miranda* rights during the interview, Andrade's responses were affirmative but minimal, and indicated that he was not previously familiar with those rights:

> "[Hale]: Okay. So you have a child that's one year old, you have a job, um it sounds like you're pretty much on track, okay and some bad stuff happened today; some bad decisions were made, and obviously we were called and now we gotta take care of business and you know we have to do what we have to do as law enforcement. And you obviously were stopped by the cops for some reason, why do you think you were stopped, we'll get into later, um but I'll tell you, we were looking for you. We were looking for your car and more specifically, like I said, we were looking for you. And I need to ask you some questions about that and before I do that though I want you to know I'm not gonna hide anything from you, I'm not going to trick you, I'm not going to lie to you, I'm not gonna try to bullshit you, I'm gonna be as open and honest with you as humanly possible, okay? We're two human beings sitting here, talking about something that

10.

happened today, it didn't happen two weeks ago, it didn't happen a month, it happened today. So there's no reason for you not to know or to have forgotten or anything else. Everything should be fresh in your mind. Another thing that you need to think about before you answer any questions is whether you really want to sacrifice everything that you have and everything that you've got going for you to be involved with something that's really not any good at all, okay? Isaac was openly honest with us, okay. He regrets what he was involved with and … and … and some of the things that happened today and some of the bad choices that he made, okay? And now we need to talk to you about it. But before we do that, I need to read you your rights, okay? You've heard them before?

"[Andrade]: No.

"[Hale]: Seen them on TV, you know what they are? You have the right to remain silent, do you understand that?

"[Andrade]: Um hmm.

"[Hale]: Right. Do you understand that?

"[Andrade]: Yeah.

"[Hale]: Anything you say may be used against you in court, do you understand that?

"[Andrade]: (nods head yes)

"[Hale]: Do you understand that?

"[Andrade]: Um hmm.

"[Hale]: You have the right to the presence of an attorney before and during any questioning if you wish, do you understand that?

"[Andrade]: Yeah.

"[Hale]: If you cannot afford an attorney one will be appointed to represent you free of charge before and during any questioning, do you understand that?

"[Andrade]: Yeah."

Hale went on immediately to question Andrade about the shooting. Andrade answered his questions without ever indicating that he wished to remain silent or to have

11.

the assistance of counsel. He admitted that when he pulled over at the Hensons' house, Isaac pulled out a gun and fired twice. He said he did not know Isaac had a gun before that. He had dropped some men off in South Dos Palos and was heading home to Los Banos. At first he said he drove down the Hensons' street in Dos Palos—which was not along the way to Los Banos—because Isaac told him to do so; Andrade denied that they were looking for Norteños. When Hale said Isaac had already admitted they were looking for Norteños, however, Andrade admitted this was true. He only expected, however, that if they found some Norteños, they would fight them. Andrade admitted he was a "Southsider," and "kick[ed] it" with a Sureño group called TST, but "didn't claim or nothing." Moments later, Andrade denied he had said they were driving around Dos Palos looking for Norteños. Then he said he would have fought Norteños if he had seen some, but was not looking for them; instead, he was just avoiding going home because he did not like being there. He did not know whether Isaac's shots had hit anyone because he was not looking. He had once lived with the two Sureños who had been killed by Norteños, and one of them was like a brother to him. The shooting of the Hensons was not revenge for their deaths, however, and Andrade did not know it was going to happen. He had never had any problems with the Hensons and had never heard of any connection between them and the two Sureño deaths. Later he again admitted that he and Isaac were looking for Norteños in Dos Palos and said he would have fought if they had found some. He continued to insist that he did not know Isaac had a gun.

The parties' evidence at the Evidence Code section 402 hearing provided some support to both sides of the question of whether Andrade's *Miranda* waiver was knowing and intelligent. On Andrade's side was Blak's testimony about a test of intellectual functioning, the Wechsler Adult Intelligence Scale, Edition IV, that he administered to Andrade. Blak testified that the results of the test showed Andrade had "a full scale IQ of 62, which would put him in the mild range of mental retardation," a range that begins at a score of 69 or 70. People with intelligence in that range, Blak opined, often respond

12.

affirmatively to questions they do not understand instead of asking for an explanation. "They typically acquiesce," he said. "In other words, they would say 'yes' or 'yeah' to the question rather than saying 'I don't know,'" even when they do not understand the question.

On cross-examination, Blak testified that he administered the test through a Spanish language interpreter. He did not use a Spanish language version of the test because he does not speak Spanish. Blak conceded that the test results could have been affected by this, as there could be "something lost in translation." Blak also conceded that Andrade's performance was better on one nonverbal subtest (not requiring English language skills) than on the remainder of the test battery. Blak did not obtain any school records for Andrade and did not contact any of his family members or anyone else who might have knowledge of his intellectual functioning. Andrade told Blak he had never been a regional center client. Blak did not contact the regional center to confirm this.

Also on Andrade's side of the ledger are some facts about his language skills. He was born in Mexico and his native language is Spanish. He moved to California at some point during his childhood and attended school until 10th grade. During the police interview, he twice indicated that he did not understand a question because of the language barrier. Once, the detective (referring to the death of Tommy Henson) asked, "[D]o you know the outcome of what happened?" Andrade replied, "Look it, I don't really know a lot of English." Another time, while discussing the pattern of rival gang members taking revenge on each other for acts of violence, the detective asked, "When does this cycle of violence end?" Andrade replied, "I don't really know what that is," and "Well like, can you explain it better?"

Supporting the People's position on the validity of the *Miranda* waiver was Andrade's apparent competence in answering the remainder of Hale's questions. The above occasions were the only two on which Andrade appeared to have any difficulty understanding Hale, and on those occasions he expressed the problem and obtained

13.

clarification.  All his other answers appeared to reflect ordinary levels of intelligence and linguistic ability.  Further, Andrade did not merely acquiesce when Hale asked leading questions or challenged his answers.  For instance, when Hale insisted that Andrade must have known that the Hensons had been linked to the murder of his friends, Andrade persisted in denying it.  When claiming ignorance of Isaac's plans, Andrade did not simply say he did not know; he elaborated, saying he urged Isaac to think of his duties to others and confess:  "I just told him to tell the truth to the cop; tell the truth, to think of my boy [Andrade's son], to think of his sister [Andrade's wife] .…"

Andrade's account of the facts was often inconsistent and implausible, but he stuck to the key elements of his story despite repeated, insistent questioning by Hale:  He did not know that Isaac had a gun, was not looking for the Hensons, and had no motive of revenge.  These claims ultimately became the basis of Andrade's defense at trial.

One exchange is particularly telling.  Hale mentioned the killing of Avalos and Medina and suggested that it was hard on Medina's surviving family members, with whom Andrade was close.  Andrade agreed, and Hale used the opportunity to try to prompt Andrade to concede he had a revenge motive.  Andrade, however, was prompt in returning to the theme that he had no foreknowledge of Isaac's intentions:

"[Hale]:      It's pretty awful what that family went through.

"[Andrade]:  I know, it's too sad.

"[Hale]:      And now you're sitting in here because you played a part in killing someone else.  Was this in retaliation for that?  Did it have any part in it?  [¶] … [¶]

"[Andrade]:  I tell you I didn't know.

"[Hale]:      You didn't know it was going to happen?

"[Andrade]:  Unh uh.

"[Hale]:      He just told you to drive down that street and so you did.

14.

"[Andrade]:   That's it."

Hale did not perceive any difficulty in communicating with Andrade.  He testified that it appeared to him that Andrade understood his *Miranda* rights.

The trial court issued a written ruling denying the motion to suppress.  It found that in light of Andrade's statements and demeanor as shown in the video recording and the court's own in-person observation of Andrade in the courtroom, the results of Blak's testing were "not an accurate measure of [Andrade's] comprehension of Detective Hale's recitation of the *Miranda* warnings and [Andrade's] waiver."  Andrade understood what was said to him and answered "with discernment."

Having viewed the video and considered the other evidence, we conclude that substantial evidence supports the trial court's factual findings that Andrade's intelligence and language skills were not a barrier to his understanding of Hale's recitation of the *Miranda* warnings, and that the psychologist's opinion was not entitled to controlling weight under the circumstances.  In the interview, which took place within hours of the shootings, Andrade developed and expressed in adequate English the key factual contentions that would be adopted by his trial counsel as the foundation of his defense.  When the detective tried to divert Andrade from his story, Andrade maintained his composure and stuck to his denials.  This accomplishment is, perhaps, no more than what many people of average intelligence and language skill could manage, but it is not consistent with intelligence and language skills so low that their possessor would be unable to waive his *Miranda* rights knowingly and intelligently.

In light of the trial court's adequately supported factual findings, we hold that the trial court reached the correct legal conclusion that Andrade's *Miranda* waiver was knowing and intelligent.

15.

## III.  *Gang expert*

Andrade argues that his trial counsel rendered ineffective assistance by failing to object to (or move for a mistrial based on) two aspects of the police gang expert's testimony.

### A.  *Questions and opinions not framed in hypothetical form*

Officer Shandara Kenzey  gave expert opinion testimony relevant to the status of the crimes as gang related.  Andrade argues that some of the questions put to Kenzey by the prosecutor, and some of his answers, referred directly to the facts and individuals involved in this case, rather than using hypothetical facts and people.  Andrade maintains that because Kenzey's testimony included opinions about what a gang member's motivations would be, his failure to adhere to the hypothetical form resulted in improper opinion testimony about Andrade's own subjective state of mind.  Andrade asserts that his trial counsel rendered ineffective assistance by failing to object to this.

We disagree.  To the extent that there were questions and answers in improper form, we conclude that there is no reasonable probability that trial counsel's failure to react to them affected the outcome of the case.  Ineffective assistance has not been established.

In a case involving similar circumstances—a gang expert's testimony about the gang relatedness of an offense—our Supreme Court recently reaffirmed the rule that an expert's opinion must be expressed in hypothetical terms.  The hypothetical questions and answers will have value only if they are closely based on the evidence in the case, but they must remain in hypothetical form lest they place the expert's authority behind inferences the jury itself is competent to make.  (*People v. Vang* (2011) 52 Cal.4th 1038, 1045-1049.)  An expert is permitted to express his opinion about the gang relatedness of a hypothetical crime that tracks exactly the prosecution's evidence, but he is not permitted "to opine that the particular defendants committed a crime for a gang purpose."  (*Id.* at p. 1049.)  An expert is permitted to give an "opinion that an assault committed in the

16.

manner described in [a] hypothetical question would be gang related," but is not permitted to give "an opinion on whether the defendants did commit an assault in that way." (*Ibid.*)

The prosecution's examination of Kenzey reflected efforts to maintain the hypothetical form, but these effort were uneven. In one set of questions, the prosecutor asked whether, if two Sureños were murdered by Norteños, their Sureño associates would be satisfied by the arrest of the Norteño killers. Kenzey said no, and that the Sureños would insist on killing Norteños in retaliation. These questions were in an appropriate hypothetical form.

Next, the prosecutor asked Kenzey to assume an adult driver and a juvenile shooter, Sureño brothers-in-law, commit a shooting, and the driver tells the passenger to confess to the police out of consideration for the driver's wife and child. The prosecutor asked whether this conversation would have gang significance. Kenzey said yes. Again, the question and answer were in proper hypothetical form.

In the next set of questions, the prosecutor said, "Assume the following facts," and then recited the facts the prosecution believed the evidence established, using the actual address of the Hensons' house, the names of victims, and the names of the two murdered Sureños—all the specifics except the names of Andrade and Isaac. Then the prosecutor asked, "In your opinion, was this crime, the murder of Tommy Henson, committed to further the activities of the Sure[ñ]o gang?" Kenzey answered affirmatively. Here the first portion of the question was still in hypothetical form, since it asked Kenzey to *assume* the facts, but it used real places and real people (except for Andrade and Isaac), not hypothetical people or places.

Then the prosecutor stopped framing his questions in hypothetical terms, and asked simply whether the crime for which Andrade was on trial was committed to benefit a gang. Kenzey said yes. The name of Andrade was still omitted, however, and when

17.

Kenzey referred to "Mr. Andrade" as part of his answer, the prosecutor reminded him to say "the driver" instead.

Even the avoidance of Andrade's name was abandoned in the end, when Kenzey was explaining his opinion in response to the question whether "this crime, the murder of Tommy Henson, was retaliation for the murders of Leonel Medina and Juan Avalos." Kenzey said it was, and referred to Andrade directly in explaining his answer:

> "Well, you have Mr. Avalos and Mr. Medina who were murdered. The defendant was very close to Mr. Medina. I believe the reports indicate they were like brothers and very close to his mother. She was almost like a mother to him. All three individuals are Sure[ñ]o gang members. Mr. Avalos and Mr. Medina were murdered, there definitely has to be retaliation for that. There were a number of shootings at the -- at Mr. Henson -- at their residence. Mr. Henson has had previous run-ins with Mr. Andrade, so they knew each other. So I believe absolutely that this was a retaliatory shooting."

We will assume that at some point along this continuum, the prosecutor and the witness departed from the hypothetical form required by *Vang*. The question is whether Andrade's trial counsel rendered ineffective assistance by failing to object.

To establish ineffective assistance of counsel, defendant must show that counsel's performance "fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694; see *People v. Hester* (2000) 22 Cal.4th 290, 296.) It is not necessary to determine whether counsel's challenged action was professionally unreasonable in every case, however. If the reviewing court can resolve the ineffective assistance claim by proceeding directly to the issue of prejudice—i.e., the issue of whether there is a reasonable probability that the outcome would have been different absent counsel's challenged actions or omissions—it may do so. (*Strickland v. Washington, supra*, 466 U.S. at p. 697.)

18.

In this case, there is little likelihood that if trial counsel had objected and the court had put a stop to the prosecutor's and expert's departures from the hypothetical form, the jury would have reached a different conclusion on the question of whether the crimes were gang related. The other evidence that the crimes were gang related was very powerful. In his statement to Hale, Andrade said he was a Sureño, was looking for Norteños to fight, and was close to the two Sureños who were murdered by Norteños. Remembrance cards for the murdered Sureños were found in Andrade's car. Eric Henson testified that on an occasion predating the shootings, he had a confrontation with Andrade in which Andrade flashed three fingers at him, a Sureño gang gesture indicative of a challenge to a rival. Kenzey testified that Andrade had three dots tattooed on his elbow, and that this was a common Sureño gang tattoo. Andrade had another tattoo, the words "[Mi] Vida Loca" (My Crazy Life), which is another common gang tattoo. A blue plaid shirt and a blue cloth belt were found in Andrade's car, and a blue bandanna was found in his pocket, all standard parts of a Sureño's attire. A correctional officer testified that when Andrade was booked into jail, he said he considered himself an active Sureño and had no safety concerns about being housed with Sureños. The officer said that when nonmembers are housed with gang members, they typically are assaulted by the members, so a nonmember volunteering to be housed with members would not be safe.

To be sure, at trial Andrade denied he was a gang member and disavowed any retaliatory motivation. The credibility of his statements, however, was likely to be viewed as weak by a jury that had viewed the recorded police interview.

In light of all this, it is not reasonably probable the jury would have declined to find true the gang enhancements and gang killing special circumstance if defense counsel had objected to the non-hypothetical expert opinions. By same token, if counsel had moved for a mistrial, it is not reasonably probable that the motion would have been granted, because the mistakes in the expert witness examination were inconsequential in

19.

light of the other evidence. Ineffective assistance of counsel therefore has not been shown.

### B.      *Expert's reliance on hearsay showing gang membership*

Among the numerous sources of information that Kenzey relied on for his opinion that Andrade was a Sureño gang member was a statement by Eric Henson to police to the effect that Andrade was a Sureño. Andrade argues that his trial counsel was ineffective for not requesting that the jury be instructed with CALCRIM No. 360, which directs that a hearsay statement relied on as the basis of an expert opinion should be considered only to evaluate the expert's opinion, not as proof that the matter stated is true.

There is no likelihood that the outcome of the case would have been different if this instruction had been requested and given. Henson testified and told the jury the same thing he had told the police: that Andrade was a Sureño. If the jurors had been told not to consider Henson's statement to the police for its truth, they still would have been able to consider the same statement Henson made in court for its truth. The instruction would have had no impact. Trial counsel's decision not to ask for it was neither professionally unreasonable nor prejudicial.

Andrade acknowledges that Henson testified Andrade was a Sureño, but says "this appears to be not so much a statement based on Eric's own knowledge as it is an assumption based on appellant's alleged act of showing three fingers." We do not see how Henson's knowledge is undermined by being based on a challenge made by a gang member to a rival gang member using a gang gesture. In any event, the jury heard the basis of Henson's knowledge and could decide for itself what weight it deserved.

Andrade also argues that Kenzey appeared to be relying on Henson's statement to the police, not on Henson's testimony at trial. This is beside the point. Regardless of which iteration of Henson's statement Kenzey had in mind, the jury heard the statement directly from Henson. The jurors were entitled to consider Henson's testimony for its

truth, so being told not to consider the same statement for its truth when it came through Kenzey would not have made any difference to them.

## IV.    *Police opinion testimony about Andrade's knowledge of Isaac's plans*

Hale was allowed to testify to the effect that Andrade was lying when he said, during the interview, that he did not know Isaac was going to shoot the Hensons. Andrade now argues that this testimony was admitted in error, since a witness should not give an opinion about another's truthfulness or give testimony tantamount to an opinion that a defendant is guilty.  As we will explain, Andrade waived his objection to this testimony at trial by asking Hale essentially the same question, intending for reasons of his own to draw attention to a remark Hale made during the interview.

Hale's interview with Andrade included the following exchange:

"[Hale]:      The shooting here, two people get killed, Northerners get shot at, they go back to the house, they shoot at that house some more.  Now Northerners get shot at, a Northerner gets killed, when does it stop?

"[Andrade]:   Well never.

"[Hale]:      Never?  So people are just going to keep taking lives, and people like you and Isaac are going to continue ruining your lives.  Isaac put you in a pretty … if you didn't know that shooting was going to happen, which I'm not totally convinced of that yet.

"[Andrade]:   Uh huh.

"[Hale]:      If, if you didn't, Isaac put you in a pretty … pretty bad position today.

"[Andrade]:   Yeah."

As was revealed in closing arguments, defense counsel wanted to show that by saying he was "not totally convinced," Hale was feigning doubt about Andrade's guilt in order to manipulate Andrade.  Counsel said Hale was trying "to get [Andrade] to warm up to him so [Andrade] will start saying things that will incriminate himself."  Pursuing this idea, defense counsel asked Hale about the remark on cross-examination:

21.

"[DEFENSE COUNSEL:] And you're saying that you didn't know that the shooting was going to happen, which I'm not totally convinced of yet.

"So you thought he might be involved in the shooting, but you had some doubt at that point?

"[PROSECUTOR]: Objection, Your Honor.

"THE COURT: Grounds?

"[PROSECUTOR]: There's no relevance, and it's for the jury to decide whether he -- whether they believe that or not and not for him to pass on the judgment.

"THE COURT: Overruled. Go ahead.

"[HALE]: As I said, I wasn't convinced that he didn't know that the shooting was going to happen.

"[DEFENSE COUNSEL:] But you weren't sure either at that point?

"[HALE:] Correct."

On redirect, the prosecutor also took up the matter of whether Hale believed things Andrade said during the interview:

"[PROSECUTOR:] You were asked whether or not he was truthful about his background or you believed he was truthful about his background, and you believe he told the truth about that, how he grew up or where he lived?

"[HALE:] I believe so.

"[PROSECUTOR:] He told the truth about that.

"Do you believe that he lied about other things in your interview?

"[DEFENSE COUNSEL]: Objection. That calls for speculation.

"THE COURT: Sustained.

"[PROSECUTOR]: Your Honor, can we have a sidebar, please?

"THE COURT: Yes."

The sidebar was not reported, but the parties have submitted a settled statement of its substance. The prosecutor argued that defense counsel had opened the door to the

22.

question by asking Hale about Andrade's truthfulness in the interview. The court agreed, and defense counsel "'acknowledged the door may have been opened.'"

After the sidebar, the prosecutor asked specifically about the portion of the interview that defense counsel had inquired into:

> "[PROSECUTOR:] You were asked -- it was pointed out to you, your question [in the interview], about whether you were convinced that the defendant didn't know anything about the shooting.
>
> "Do you remember being asked about that?
>
> "[HALE:] Correct. I do.
>
> "[PROSECUTOR:] What do you think now about whether the defendant was involved and knew about the shooting?
>
> "[HALE:] I believe he knew it was going to happen."

A party is estopped from asserting as a ground for reversal any error induced or invited by his or her own conduct. (*Kardly v. State Farm Mut. Auto. Ins. Co.* (1995) 31 Cal.App.4th 1746, 1750; *Abbott v. Cavalli* (1931) 114 Cal.App. 379, 383.) In criminal cases, this doctrine applies where "[d]efense counsel [is] deemed to have intentionally caused the claimed 'error.'" (*People v. Marshall* (1990) 50 Cal.3d 907, 931.)

It is clear from the record that Andrade's trial counsel initiated this line of questioning because he hoped to gain an advantage by showing that Hale was not acting in good faith during the interview. He is estopped from complaining on appeal that the prosecutor pursued the same matter on redirect.

This case is similar on this point to *People v. Steele* (2002) 27 Cal.4th 1230. In that case, defense counsel asked a prosecution expert on cross-examination whether the killing at issue might have been committed in a rage. On redirect, the prosecutor asked the expert whether the killing might instead have been methodical. On appeal, the defendant argued that "this 'whole line of testimony should have been excluded'" as improper opinion evidence. (*Id.* at p. 1247.) Noting that "[t]he defense, …, not the

23.

prosecution, initiated this 'whole line of testimony,'" (*ibid*.) the Supreme Court held that the prosecutor's redirect was proper in light of the defendant's cross-examination (*id*. at p. 1248).

Andrade argues that his counsel's questions did not really ask about whether Andrade was truthful during the interview, while the prosecutor's questions did ask about that, so his counsel did not actually ask about the same matter that the prosecutor asked about. We do not see the distinction. The substance of the questions of both counsel, so far as they matter for Andrade's claim that Hale improperly opined about Andrade's knowledge, was whether Hale thought it was true when Andrade said he did not know there was going to be a shooting.

Andrade also argues that the prosecution should not have been allowed to take advantage of defense counsel's decision to go into the matter because the prosecution did not object. This argument fails for two reasons. First, the prosecution did object, saying it was for the jury to decide what Andrade knew; the objection was overruled. Second, objection is not necessary to bring the invited error doctrine into effect: "We do not believe … that a party may ask relevant questions, then, when the other side does not object, prevent all cross-examination (or redirect examination) responding to the same point by successfully asserting that its own question was improper.… [T]he matter lies within the discretion of the trial court, which should strive to prevent unfairness to either side when one side presents evidence on a point, then tries to prevent the other side from responding." (*People v. Steele, supra*, 27 Cal.4th at p. 1248.)

Andrade next argues that he did not open the door because his counsel's question to Hale was only a response to an item of the People's evidence, namely the recording and transcript of the interview itself. He says it would be "patently unfair" to allow the prosecution to ask Hale the same question since it was the prosecution that introduced the evidence of the interview. We do not see how it is unfair. Andrade does not claim the interview was inadmissible. After the defense sought advantage by asking Hale what he

24.

meant about being "not totally convinced" that Andrade was ignorant of the impending shooting, it was not unfair to allow the prosecution to ask Hale about the same remark.

Finally, Andrade asserts that we should not find that trial counsel forfeited the issue by conceding during the sidebar that he might have opened the door to the prosecutor's question. We are not so finding. Our holding is that defense counsel invited the error Andrade now complains of—and thus waived the issue for purposes of appeal— by questioning Hale on the same matter he says is inadmissible. It is unnecessary to decide whether he also forfeited or waived the issue by his remarks in the sidebar.

## V.      *Accomplice testimony*

The jury heard evidence of statements made to the police by Isaac to the effect that he and Andrade were driving around looking for Norteños and that the shootings were revenge for the killings of Medina and Avalos. Andrade argues that the court erred in not giving, on its own motion, a jury instruction that statements of an accomplice must be viewed with caution and must be corroborated.

Section 1111 provides in part:

"A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

"[T]estimony" in this context includes an accomplice's out-of-court statements "'used as substantive evidence of guilt [and] made under suspect circumstances. The most obvious suspect circumstances occur when the accomplice has been arrested or is questioned by the police.'" (*People v. Williams* (1997) 16 Cal.4th 153, 245.)

When the prosecution presents evidence of accomplice testimony that implicates the defendant, the trial court has a sua sponte duty to instruct the jury that "the testimony of an accomplice is to be viewed with distrust and that the defendant may not be convicted on the basis of an accomplice's testimony unless it is corroborated." (*People v.*

25.

*Hayes* (1999) 21 Cal.4th 1211, 1271.) CALCRIM Nos. 334 and 335 are pattern instructions provided for this purpose. The goal of instructing the jury pursuant to section 1111 is to "ensure that a defendant will not be convicted solely upon the testimony of an accomplice because an accomplice is likely to have self-serving motives." (*People v. Davis* (2005) 36 Cal.4th 510, 547.)

We review de novo the court's omission of the instruction. Even when an instruction is required, its omission is harmless unless there is a reasonable probability that a defendant would have obtained a better result if it had been given. (*People v. Breverman* (1998) 19 Cal.4th 142, 178.) More specifically, failure to give a required instruction pursuant to section 1111 is harmless if there is sufficient corroborating evidence. "Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense." (*People v. Hayes, supra*, 21 Cal.4th at p. 1271.)

During Hale's interview with Andrade, Hale repeated several things Isaac had told police: Isaac regretted his involvement; he and Andrade were driving around Dos Palos looking for Norteños; and Medina and Avalos were friends of Andrade. During trial, Hale testified to several additional statements made by Isaac: the shootings were payback; Isaac was not close friends with Medina and Avalos, unlike Andrade; and Andrade was unaware of the shooting. Isaac asked Hale what would happen to him if he took the blame for the shooting.

The People argue that the requirement to give an instruction on accomplice testimony "did not apply in this case" because Isaac's statements were not self-serving. Instead, the main point of Isaac's statements was to take the blame and exculpate Andrade. We understand that the motivation behind the rule requiring the instruction is to guard against convictions based on the self-serving claims of accomplices of the defendant. The People cite no authority, however, for their view that the applicability of the requirement depends on a prior determination that the accomplice testimony was self-

26.

serving. The authorities we have cited above indicate simply that the instruction must be given if the jury hears accomplice statements that implicate the defendant and that were made under certain circumstances, including the circumstance that the accomplice was under police questioning. We are not persuaded that the instruction was not required.

The fact that Isaac's statements did not attempt to exculpate Isaac at Andrade's expense does, however, help to persuade us that any error in failing to give the instruction was harmless. Given the self-incriminating nature of Isaac's statements taken as a whole, there is no likelihood that the jury would have rejected the portions of Isaac's testimony that damaged Andrade if it had received the instruction at issue. Being told to view an accomplice's testimony with caution based on the notion that an accomplice wants to shift blame from himself to the defendant would not support a decision to reject testimony by an accomplice who is taking the fall. That Isaac said some things that were incriminatory to Andrade along the way does not make those things unreliable when the general thrust of his statements was to take the blame on himself. This general thrust might reasonably be seen as making the incriminating details *more* reliable: If Isaac included those harmful facts even though he was trying to exculpate Andrade, it is more likely that he did so simply because they were true.

In addition, there was ample corroborating evidence. Andrade admitted he drove Isaac to the scene of the crimes. His car was seen there during the shootings. The murder weapon was found in the car. His gang membership and the murder of his friends and fellow gang members provided him with a motive. During his interview with Hale, he could not adequately explain why he drove to the Hensons' house, which was not on his way from South Dos Palos to Los Banos. His claim that he saw and heard nothing as he sat in his car during the shootings was wildly implausible.

It is not reasonably probable that Andrade would have obtained a better outcome if the instruction on accomplice testimony had been given. We conclude that if the court was required to give the instruction, its failure to do so was harmless error.

27.

## *DISPOSITION*

The judgment is affirmed.

_____
DETJEN, J.

WE CONCUR:


_____
CORNELL, Acting P.J.


_____
GOMES, J.